| | | |
|---|---|---|
| JACQUELINE CONWAY | * | IN THE |
| Plaintiff | * | UNITED STATES |
| v. | * | DISTRICT COURT |
| JASMINE JEFFRY, ET AL. | * | OF MARYLAND |
| Defendant | * | *Northern District* |
| | * | |
| | * | Case: 1:25-cv-01826-MJM |

*************************************************************************

### AFFIDAVIT OF JACQUELINE CONWAY

**I HEREBY DECLARE OR AFFIRM UNDER PENALTY OF PERJURY** that the foregoing Statement is true based upon my personal knowledge, that I am over 18 years of age, and competent to testify to the matters contained herein:

1. That my name is Jacqueline Conway, I am 61 years old, a retired Captain of the Baltimore City Sheriff's Department --the first African-American female to hold that position in the Department's 180 year history; I reside at 1616 Shadyside Road, Baltimore, Maryland 21218.
2. I am a lawful gun owner with a Concealed Carry Weapon permit; I've been trained on the use of a firearm, use of force and self-defense techniques.
3. That I retired due to back issues and career-ending back surger(ies).
4. In my spare time, I deliver food for DoorDash.
5. I submit this affidavit in support of my claims arising from my wrongful arrest and unlawful treatment on October 29, 2024, in Baltimore County, Maryland, by PO Jasmine Jeffry and Sgt. Bryan McDowell.
6. On October 29, 2024, at approximately 2:03 p.m., I was working my part-time job delivering food for DoorDash when I arrived at a residence located at 1733 Edgewood Road in the Loch Raven area of Baltimore County, Maryland.
7. The customer, a 21-year-old, 6'3, man named Keyon Agnew, deliberately answered the door with his genitals exposed and his penis erect.
8. He looked me in the eyes, leaning one of his forearms above his head against the doorframe while the other arm rested on his hip. He smiled at me, looked down at his aroused genital, then looked back up at me with raised eyebrows and a tilted grin, sexually suggestively.
9. I was shocked, offended, and frightened by his lewd and indecent exposure. I immediately returned to my vehicle, and called 911 multiple times. I moved my car across the street, diagonally from his home, to create distance and await police. Mr. Agnew then began repeatedly texting and calling my phone. I answered one call and the customer addressed me with an angry tone and a profanity-laced directive to leave his community. After that, I ignored an innumerable amount of others harassing calls from Mr. Agnew that came in quick succession.
10. Moments later, Mr. Agnew came outside in an aggressive and violent manner,



flailing his arms, clenching his fists, shouting profanities, and threatening to harm me.

11. Fearing for my life and realizing how vulnerable I was sitting inside my vehicle, I retrieved my lawfully owned and permitted firearm. I unholstered it and held it in a low-ready position, pointed downward toward the passenger-side floorboard to avoid confrontation and protect myself if necessary.

12. I commanded him to back away from my car. He complied and returned to his home, at which point I safely put my firearm away. I then drove to the next street over to wait in a safer location while continuing to call 911. I was intent on pressing charges for indecent exposure, solicitation, and possibly assault.

13. I called 911 at least two to three times. When no officer was dispatched, I decided to drive to the Towson police precinct to press charges. On the way, I encountered Baltimore County Police Officer Jasmine Jeffry in the parking lot of a Walgreens. I told her what happened. She confirmed my 911 calls and we returned to the scene of the incident together.

14. Once there, Officer Jeffry's supervisor, Sgt. Bryan McDowell (#5819), joined the investigation. Sgt. McDowell parked behind my SUV, boxing me in. Additional officers took positions around my vehicle, effectively detaining me inside my vehicle. I was not free to leave.

15. Eventually, I was ordered to step out of the vehicle and placed in handcuffs.

16. Both Officer Jeffry and Sgt. McDowell gathered information from Mr. Agnew and me. They were fully aware of my reasonable fear for my safety, my status as a retired law enforcement officer, the fact that the customer never saw a firearm, and my report as a victim of a sex offense.

17. The customer explicitly stated he believed he saw a Taser in my left hand, not a gun, and repeatedly insisted he never observed a firearm and I pointed one in his direction.

18. Despite this, I was arrested and charged with first- and second-degree assault –which carried up to 35 years of imprisonment combined and a $2,500 fine. Immediately prior to my arrest and during, I feared I would be arrested and thereby assaulted without probable cause or legal justification; she also feared that handcuffs would be applied to her wrists in public and that I would be taken into police custody without consent. All of my fears became true.

19. No part of my conduct constituted criminal activity. I never pointed a firearm at Mr. Agnew, I made no physical contact, and he was never placed in reasonable apprehension of harm unjustifiably. The firearm remained in a low-ready position pointed downward at all times.

20. Importantly, Sgt. McDowell had corroborating evidence that my actions were lawful, defensive, and measured.

21. The customer had aggressively walked up to my vehicle very aggressively, yelling threats and appearing physically menacing. I responded in a way consistent with my training and out of genuine fear for my life. I'm too old to get in a physical altercation with a 21 year old man.

22. Despite knowing I had no criminal record, was respectful, polite and cooperative, had all the necessary credentials and permits of a retired law enforcement officer, and committed no crime, PO Jeffry's and Sgt. McDowell falsely arrested me anyway. I was handcuffed, transported to the precinct, placed in a holding cell, and fitted with leg irons unjustly for hours.

23. The handcuffs were applied too tight and caused severe pain due to my recent back surgeries and transportation in the cramped back seat of PO Jeffry's police car.

24. My personal belongings and vehicle were left exposed to the individual who had

2

just victimized and frightened me.

25. The following day, Officer Jeffry sent me a text message expressing "concern" about my wrongful arrest. She forwarded her report and the charges to the State's Attorney's Office. After reviewing the case, Assistant State's Attorney Samuel Dominick, III, declined to prosecute.

26. According to Officer Jeffry's own report, ASA Dominick concluded that my arrest had been made prematurely and without a full investigation. He found no evidence of criminal intent on my part and determined that the case would be dismissed.

27. On November 22, 2024, my first trial date, all charges --including the felony first-degree assault --were formally dismissed.

28. The entire investigation was recorded on body-worn cameras, but the footage of my initial encounter at Walgreen's, PO Jeffry's return to the scene, and her discussions with her supervisors were conspicuously withheld.

29. I was left fearful, humiliated, and emotionally traumatized. I had sought police protection as a victim of a sex offense and was instead arrested in front of the very man who exposed himself and solicited me for assignation.

30. Sgt. McDowell and PO Jeffry knew I was 60 years old, 5'3", and that Mr. Agnew, 21, 6'3, was a much younger, stronger man. They knew I was lawfully performing my job as a food delivery driver and that I had acted in lawfully in self-defense.

31. They chose to ignore all of that and unlawfully arrest me while allowing my offender to walk free. They refused to charge Agnew under CP §2-203(b)(6), even though probable cause existed until a month later, after my story hit the news. Their actions were malicious and humiliating and have left me emotionally scarred.

32. They violated my Fourth and Fourteenth Amendment rights by arresting and imprisoning me without probable cause and also violated my Second and Fifth Amendment rights by unlawfully seizing my firearm and not returning it.

33. The customer, Agnew, never apologized nor appeared to be apologetic towards me. I never reported to PO Jeffry nor any other officer that customer, Agnew, appeared apologetic or that he had on underwear. He did not have on underwear, he was exposed.

34. While in police custofy, I made comments on a few occasions that PO Jeffry's was just "doing her job." Those comments were either sarcasm or to mollify PO Jeffry to ensure that she processed my paperwork with deliberate speed so I could return home to my family as swiftly as possible. I did not be subjected to any further police abuses or misconduct. Everything PO Jeffry and Sgt. McDowell did to me was wrongful and I had no intention of diminishing or relieving them of their guilt in the short term or their liability in the long term.

35. My statements, as captured on Officer Jeffry's body-worn camera, should not be interpreted as proof that I was uninjured, unaffected, or unbothered. My calm tone and restrained demeanor were not signs of comfort --they were survival tactics. I relied on pain tolerance, code-switching, and measured speech out of fear that any display of emotion or frustration could be misread and escalate the situation. I remained composed because I feared what might happen if I didn't. The footage reflects not a lack of harm, but my instinct to protect myself in a situation I could not control. My outward composure does not erase the pain, humiliation, or violation I experienced. I was in a lot of pain from the excessive force exacted upon me as mentioned above.

3

7/11/25
Date

_Jacqueline Conway_
Jacqueline Conway

4